UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES CONLEY                                              CIVIL ACTION

VERSUS                                                   NO. 16-9967

CAROLYN W. COLVIN, ACTING                                SECTION "G" (2)
COMMISSIONER OF SOCIAL SECURITY

## FINDINGS AND RECOMMENDATION

Plaintiff, James Conley, seeks judicial review pursuant to Section 405(g) of the

Social Security Act (the "Act") of the final decision of the Commissioner of the Social

Security Administration ("Commissioner"), denying plaintiff's claim for disability

insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles

II and XVI of the Act. 42 U.S.C. §§ 423, 1382c. This matter was referred to a United

States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

I.     PROCEDURAL HISTORY

Conley filed his applications on December 19, 2013, alleging disability since

January 1, 2013, due to the residual effects of a stroke, memory loss, anxiety, high blood

pressure and hearing loss in his left ear. (Tr. 135, 142, 173). After his claims were denied

at the agency level, plaintiff requested a hearing before an Administrative Law Judge

(ALJ), which was held on November 13, 2014. (Tr. 35-65). The ALJ issued a decision

denying the applications on February 27, 2015. (Tr. 11-20). After the Appeals Council

denied review on April 15, 2016, the ALJ's decision became the Commissioner's final

decision for purposes of this court's review. (Tr. 1-5).

Plaintiff filed a timely memorandum in support of his appeal.  Record Doc. No. 21.

Defendant filed a timely reply memorandum.  Record Doc. No. 22.

II.    STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the Commissioner made the following errors:

A.    The ALJ erred by failing to find that Conley's anxiety and mood disorder, urinary frequency and obstructive sleep apnea are severe impairments.[1]

B.    The ALJ erred by failing to consider the combined effects of plaintiff's multiple impairments.

C.    The ALJ did not follow proper legal standards in determining how much weight to accord the opinions of Conley's treating physicians.

D.    The ALJ failed to properly consider evidence indicating that plaintiff did not have the residual functional capacity to "sustain" any significant gainful employment.

III.    ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

1.    Plaintiff meets the insured status requirements of the Act through December 31, 2014.

2.    He has not engaged in substantial activity since the alleged onset date of January 1, 2013.

---

[1]Conley included hypertension in this assignment of error on page 7 of his memorandum, but did not include it in the subheading or text of his argument on pages 8 through 11 of his memorandum. Record Doc. No. 21.  Accordingly, any argument that plaintiff's hypertension is a severe impairment is deemed abandoned.  Huskey v. Colvin, 560 F. App'x 367, 370 (5th Cir. 2014); Munson v. Comm'r of Soc. Sec. Admin., No. 12-369-RLB, 2014 WL 1165837, at *3 (M.D. La. Mar. 21, 2014).

3.     Plaintiff has severe impairments consisting of cardiac dysrhythmia[2] and syncopal episodes.[3] His benign prostatic hypertrophy[4] and anxiety are non-severe impairments.

4.     He has the residual functional capacity to perform light work, except that he can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; must avoid all exposure to workplace hazards such as moving machinery and heights; can occasionally reach in all directions; and once per quarter, on an unpredictable basis, will miss work for one day.

5.     Conley's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. However, his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

6.     He can perform his past relevant work as a probation and patrol officer.

7.     Plaintiff was not under a disability from January 1, 2013, the alleged onset date, through the date of the decision.

(Tr. 11-20).

IV.    ANALYSIS

A.    Standards of Review

The function of this court on judicial review is limited to determining whether there

is substantial evidence in the record to support the final decision of the Commissioner as

---

[2]Dysrhythmia is "an abnormal rhythm; especially : a disordered rhythm exhibited in a record of electrical activity of the brain or heart." MedlinePlus Medical Dictionary (Merriam-Webster, Inc. 2017), http://c.merriam-webster.com/medlineplus/dysrhythmia (visited Jan. 31, 2017).

[3]Syncope is a "loss of consciousness resulting from insufficient blood flow to the brain." Id., http://c.merriam-webster.com/medlineplus/syncope (visited Jan. 31, 2017).

[4]Benign prostatic hypertrophy or hyperplasia means an enlarged prostate gland. Mayo Clinic (Mayo Foundation for Medical Education and Research 2017), http://www.mayoclinic.org/diseases-conditions/benign-prostatic-hyperplasia/basics/definition/con-20030812 (visited Jan. 31, 2017).

trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Richard ex rel. Z.N.F. v. Astrue, 480 F. App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at 363-64; Perez, 415 F.3d at 461. This court may not reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. Halterman ex rel. Halterman v. Colvin, 544 F. App'x 358, 360 (5th Cir. 2013) (citing Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364. The Commissioner, rather than the courts, must resolve conflicts in the evidence. McCaskill v. Dep't of Health & Human Servs., 640 F. App'x 331, 332-33 (5th Cir. 2016) (citing Perez, 415 F.3d at 461); Luckey v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial

evidence supports it.  Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008) (citing Perez, 415 F.3d at 461).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for DIB, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2014).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.[5]  Id. §§ 404.1520, 416.920; Alexander v. Astrue, 412 F.

---

[5]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the

App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue, 501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461. The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Id.

The claimant has the burden of proof under the first four parts of the inquiry.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'"  Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

---

physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

B.    Factual Background

Conley testified at the hearing on November 13, 2014 that he was born in 1953, completed two years of college, is divorced and lives by himself in Independence, Louisiana. (Tr. 42-43). He said that his sister brought him to the hearing. (Tr. 43). He stated that his driver's license is suspended and his doctor told him not to drive because he passes out "at any given notice." He said he wears a red armband so paramedics can recognize his condition if he passes out. He testified that he has passed out three or four times since January 2013, but could not recall whether the last time was in 2014 or 2013. He stated that all he remembers from the last occurrence is waking up in the hospital. He testified that he served in and was honorably discharged from the Navy. (Tr. 44-45).

Conley stated that he takes multiple prescription medications, including trazodone[6] for urination, diazepam,[7] naproxen[8] for pain and inflammation, cyclobenzaprine[9] for sleep,

---

[6]Trazodone hydrochloride is used to treat depression. PDR.net (PDR, LLC 2017), http://www.pdr.net/pdr-consumer-monograph/trazodone?druglabelid=3033&ConsumerId=1128 (visited Jan. 30, 2017).

[7]Valium (generic name: diazepam) is used for the management of anxiety disorder, symptoms associated with alcohol withdrawal, muscle spasms and seizures. Id., http://www.pdr.net/pdr-consumer-monograph/valium?druglabelid=2100&ConsumerId=1473 (visited Jan. 23, 2017).

[8]Anaprox or Naprosyn (generic name: naproxen) is a nonsteroidal anti-inflammatory drug used to treat various forms of arthritis, tendinitis, bursitis, gout and pain. Id., http://www.pdr.net/pdr-consumer-monograph/anaprox-ec-naprosyn-naprosyn?druglabelid=2069&ConsumerId=1283 (visited Jan. 30, 2017).

[9]Cyclobenzaprine (former brand name Flexeril) is used along with rest and physical therapy to relieve muscle spasms associated with short-term, painful musculoskeletal conditions. Id., http://www.pdr.net/pdr-consumer-monograph/cyclobenzaprine?druglabelid=3089&ConsumerId=1179 (visited Jan. 30, 2017).

Keppra[10] for seizures, a recently increased dosage of tamsulosin[11] for urination and a new medication, doxepin,[12] to help him stay asleep.  He said he uses a CPAP machine, but still wakes up during the night.  He stated that his sister and neighbors keep an eye on him because he sleepwalks and does not remember doing it.  He said he has been taking losartan[13] for high blood pressure since 2011.  (Tr. 46-47).

Plaintiff stated that he urinates a lot and wears an adult diaper if he goes somewhere, such as to church.  When the ALJ pointed out that tamsulosin is designed to enable urination, rather than impede it, and questioned whether it might be causing Conley to go to the bathroom more, plaintiff said the drug is prescribed by "Dr. John."[14]  He said he has not told his primary care provider, Dr. Kowaleski,[15] about his urination problem because she is female and he considers it too personal.  (Tr. 47).

---

[10]Keppra (generic name:  levetiracetam) is used in combination with other medicines to treat and decrease the frequency of certain types of seizures.  Id., http://www.pdr.net/pdr-consumer-monograph/keppra?druglabelid=1054&ConsumerId=5259 (visited Jan. 30, 2017).

[11]Flomax (generic name:  tamsulosin hydrochloride) is used to treat benign prostatic hyperplasia.  Id., http://www.pdr.net/pdr-consumer-monograph/flomax?druglabelid=2893&ConsumerId=1180 (visited Jan. 30, 2017).

[12]Doxepin hydrochloride is used to treat depression and anxiety.  Id., http://www.pdr.net/pdr-consumer-monograph/doxepin-capsules-10mg-25mg-50mg-75mg-100mg?druglabelid=1965&ConsumerId=1406 (visited Jan. 30, 2017).

[13]Cozaar (generic name: losartan potassium) is an angiotensin receptor blocker that is used alone or in combination with other medications to treat high blood pressure and lower the risk of stroke in people with high blood pressure and left ventricular hypertrophy.  Id., http://www.pdr.net/pdr-consumer-monograph/cozaar?druglabelid=339&ConsumerId=1104 (visited Jan. 30, 2017).

[14]Presumably this refers to John Finn, Jr., M.D., plaintiff's treating internist at the Southeast Louisiana Veterans Administration Hospital and clinic (the "V.A.").

[15]According to the V.A. medical records, Barbara Kowaleski is a nurse practitioner.

Conley testified that he has a heart monitor and a CPAP machine that he is supposed to use every night. He said he has to monitor his heart daily because the lower part of his heart stops beating when he sleeps. He stated that, on an average night, he sleeps for two or three hours, is awake for a while and then lies down again if he is sleepy. He testified that he goes to sleep every afternoon after taking his medications.

Conley said that, because he cannot control his urine at times, he wears adult diapers when he may not be near a bathroom, but he does not wear them daily. (Tr. 48). He stated that he stopped driving in 2013. He said he has had urination problems since 2007 and has been treated by Dr. Kowaleski since about that time. He testified that he has prostatitis, which causes shooting pain in his rectum, he sits down until it passes and he takes medication to reduce the swelling. He said that his doctors have told him that prostatitis is a factor in his frequent urination. (Tr. 49).

Conley testified that he has pain in his lower back, lower legs, feet, neck and hands and that sometimes he can hardly make a fist. He stated that the pain occurs every two or three days, depending on the weather. He said he cannot hold anything in his left hand and can only use it for things that are not heavy. He stated that he opens medicine bottles by holding them between his legs and pressing down with his right hand.

Plaintiff testified that he had heart surgery at East Jefferson General Hospital the previous summer because he "had a vessel that [was] touching in the wrong place or something like that, and they put that [unspecified] in to alleviate that problem, and they

thought that was a part of my sleep thing, but it wasn't because when they gave me the test for the sleep thing, I was out of control." (Tr. 250). He said he also had surgery to implant a pacemaker.

Conley stated that he used to be able to run, jump, skip, hop and walk at a fast pace, but he cannot do those things anymore. He said he gets winded and cannot always catch his breath. He estimated he can walk four to five blocks before he has to stop to catch his breath. He stated that his doctors told him not to lift anything heavy above his head and to be careful because he could pull the wires in his heart loose. (Tr. 51). He said he feels excruciating pain if he lifts his left arm over his head and is unable to reach around to scratch his back with his left arm because of pain. (Tr. 51-52).

Plaintiff testified that Keppra knocks him out and makes him nauseated when he takes it once a day, but that drinking a little vinegar or Sprite stops the nausea. He stated that, on a typical day, he wakes up, says his prayers and sits for a while. He said he sometimes wakes up between 1:30 and 3:00 a.m. and cannot go back to sleep for a couple of hours. He said he gets up if he feels good when he wakes up, but sometimes he feels bad and stays in bed until he feels better. He testified that sometimes he leaves his house daily, but some weeks he does not go out except to church on Sunday.

Conley testified that he has no outside activities other than going to church. He stated that he does not go to any baseball or football games because he gets excited and has to take his medication, which puts him to sleep. He said that "people with attitudes"

increase his anxiety. (Tr. 53). He testified that Dr. Jackson, his treating psychiatrist, increased the dosage of his doxepin a few days ago because Dr. Jackson told him he has confused night and day in his sleep patterns. (Tr. 54).

Plaintiff stated that his pacemaker was put in before the previous summer because he had irregular heart rhythm. He said he quit smoking when he was told he needed a pacemaker and he now chews tobacco instead. He admitted that he had refused tobacco cessation classes offered by his doctors and said that smoking or chewing tobacco helps calm his nerves. (Tr. 56-57).

In addition to the jobs of school janitor and police officer about which the vocational expert testified (see below), Conley said he had worked as a probation counselor. (Tr. 58-59). He stated that he had not applied for disability benefits from the VA because he did not know he could. (Tr. 64).

C.      Vocational Expert Testimony

A vocational expert, Patricia Knight, testified at the hearing that plaintiff's former work as a school janitor was unskilled, heavy labor; his work as a police officer was skilled at a medium exertional level; and his probation and parole officer job was skilled and light. (Tr. 59-60). The ALJ posed a hypothetical of a person with the same education and work experience as plaintiff and who is 60 years old; can perform work at the light exertional level; can occasionally climb ramps and stairs; can never climb ladders, ropes and scaffolds; and must avoid all exposure to workplace hazards, such as moving machinery

and heights.  Knight stated that such a person could perform plaintiff's past relevant work as a probation and parole officer.

The ALJ modified the hypothetical to add that the individual would miss one day of work per quarter on an unpredictable basis.  Knight testified that her answer would not change.  When the ALJ added an additional restriction that the hypothetical person could only occasionally engage in reaching in any direction, Knight stated that the person could still work as a probation and parole officer.  (Tr. 61).

Upon questioning by plaintiff's attorney, Knight testified that a person who, in addition to the limitations posed in the ALJ's second hypothetical, is unable to work for at least two days during every month would not be able to maintain any employment.  The attorney modified the hypothetical so that, instead of missing two days of work per month, the hypothetical person would have to take unscheduled breaks of five to ten minutes at least once every hour.  (Tr. 62).  Knight said that such a person would not be able to perform any job because he would be off task too much.  (Tr. 62-63).

Plaintiff's attorney asked whether a claimant like the one in the ALJ's third hypothetical, who was also unable to reach overhead with the left arm and unable to grip, grasp or turn anything with his left hand, could work.  Knight testified that such a person could perform the job of probation and parole officer.  In response to another modification by plaintiff's attorney, Knight stated that the same hypothetical person who also had to take

an unscheduled break every afternoon for at least one hour on at least two days in a five-day work week would not be able to perform any job.  (Tr. 63).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 14-15, 16-19).  I find the ALJ's summary substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1.    The ALJ did not err by failing to find that plaintiff's anxiety and mood disorder, urinary frequency and obstructive sleep apnea are severe impairments.

At the second step of the sequential evaluation, the ALJ found that Conley's cardiac dysrhythmia and syncopal episodes are severe impairments, but his benign prostatic hypertrophy and anxiety are non-severe impairments.  (Tr. 13-15).  Plaintiff argues that the ALJ erred by failing to find that his anxiety and mood disorder, urinary frequency and obstructive sleep apnea are severe.

In the Fifth Circuit, "[a]n impairment is not severe 'only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" Herrera v. Comm'r of Soc. Sec., 406 F. App'x 899, 902 n.1 (5th Cir. 2010) (quoting Loza v. Apfel, 219 F.3d 378, 391 (5th Cir. 2000)); accord Stone v. Heckler, 752 F.2d 1099, 1101

(5th Cir. 1985).  The ALJ cited the relevant standard and explained why he found that plaintiff's benign prostatic hypertrophy and anxiety were not severe.

At the second step of the evaluation, the ALJ determines the "medical severity" of the claimant's medically determinable impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  When the ALJ has proceeded beyond step two to find at a subsequent step that a claimant is not disabled, plaintiff's argument that the ALJ failed at step two to find that a particular impairment is severe

> is inapposite because the ALJ did not [deny] plaintiff's benefits based on a finding that [his] impairments are not severe.  See Chapparo v. Bowen, 815 F.2d 1008, 1011 (5th Cir. 1987) (argument regarding improper application of Stone standard irrelevant to disposition of case if outcome of case [did] not turn on issue of severity); see also Shipley v. Director of Health and Human Services, 812 F.2d 934, 935 (5th Cir. 1987).  The ALJ's report contains a statement of the Stone standard and a determination that as it applied to this case, [one of claimant's several alleged impairments] is a severe impairment. . . .  The ALJ then proceeded to the next step of the sequential evaluation and assessed whether an impairment or a combination of plaintiff's impairments met or exceeded the severity of the impairments listed in the appendix.  See 20 C.F.R. § 404.1594(f)(2).  In the absence of a "non-severe" finding as to any one of plaintiff's impairments and a decision to [deny] plaintiff's benefits based on a "non-severe" finding, plaintiff cannot complain that any prejudice resulted from the ALJ's performance at this stage in the evaluation.  See Brock v. Chater, 84 F.3d 726, 729 (5th Cir. 1996) (decision will not be reversed where claimant makes no showing that she was prejudiced by deficiencies she alleges).

Lawrence v. Barnhart, No. 01-1366, 2002 WL 356316, at *2 (E.D. La. Mar. 4, 2002); see also Taylor v. Astrue, 706 F.3d 600, 603 (5th Cir. 2012) ("any error by the ALJ in not following the procedures set out in Stone [at step two] is harmless" when the ALJ found at step five that plaintiff was not disabled by his severe impairments); Bradshaw v. Astrue,

No. 1:07-CV-0150-C, 2008 WL 4387087, at *6 (N.D. Tex. Sept. 26, 2008) (citing Robinson v. Barnhart, 183 F. App'x 451, 455 (5th Cir. 2006); Reyes v. Sullivan, 915 F.2d 151, 154 n.1 (5th Cir. 1990); Chapparo, 815 F.2d at 1011) ("In more recent cases, the Fifth Circuit has found no merit to claimants' arguments of ALJ error arising out of the failure to correctly apply or state the Stone standard where the sequential evaluation process proceeds past step 2."); accord Arnett v. Astrue, 676 F.3d 586, 591 (7th Cir. 2012); Delia v. Comm'r of Soc. Sec., 433 F. App'x 885, 887 (11th Cir. 2011) (citing Reeves v. Heckler, 734 F.2d 519, 524 (11th Cir. 1984)); Nejat v. Comm'r of Soc. Sec., 359 F. App'x 574, 577 (6th Cir. 2009) (citing Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987)).

"Because the ALJ did not summarily dispose of Plaintiff's claims at Step Two, but instead determined that Plaintiff had at least one severe impairment and proceeded to Step Four to determine that Plaintiff was not disabled, the proper focus here is whether substantial evidence supports the ALJ's residual functional capacity (RFC) assessment and ultimate determination that Plaintiff was not disabled." Lavery v. Astrue, No. V-11-3, 2012 WL 3276711, at *5 (S.D. Tex. Aug. 8, 2012) (citing Chaparro, 815 F.2d at 1011) (footnote omitted).

Having found at step two that Conley had some severe impairments, the ALJ proceeded through the subsequent steps, considered all of the evidence concerning plaintiff's medically determinable impairments, and found that Conley could perform light

work with the restrictions noted in the decision and could perform his past relevant work as a probation and patrol officer.  The ALJ's failure to find at step two that plaintiff's anxiety and mood disorder, urinary frequency and obstructive sleep apnea are not severe is irrelevant and non-prejudicial to him.

Even if the court were to review the ALJ's step two determination, substantial evidence supports his finding that these conditions are not severe for the reasons cited in the ALJ's opinion.  With respect to each of these problems, plaintiff relies primarily on his own testimony and self-reported symptoms, which are insufficient to establish a severe medical impairment.  Charles v. Colvin, 628 F. App'x 290, 291 & n.3 (5th Cir. 2016).  Subjective complaints must be corroborated by objective medical evidence, Quijas v. Astrue, 298 F. App'x 391, 393 (5th Cir. 2008) (citing Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001)); Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989), and such complaints may be discounted when the alleged symptoms are not consistent with the objective medical evidence.  Brown v. Astrue, 344 F. App'x 16, 21 (5th Cir. 2009); Hernandez v. Astrue, 278 F. App'x 333, 340 (5th Cir. 2008) (citing Anthony, 954 F.2d at 295); Dunbar v. Barnhart, 330 F.3d 670, 672 (5th Cir. 2003).

Conley also relies on his diagnoses of adjustment disorder with mixed features, including anxiety, and sleep apnea.  However, "[t]he severity of an impairment is measured in terms of its effect on the claimant's ability to work.  A mere diagnosis is insufficient to establish that an impairment is severe because it does not reveal the extent to which the

impairment limits the claimant's ability to work." Stone v. Astrue, No. 8:12-cv-35-T-17TBM, 2013 WL 1212889, at *6 (M.D. Fla. Feb. 26, 2013), report & recommendation adopted, 2013 WL 1212881 (M.D. Fla. Mar. 25, 2013), aff'd, 586 F. App'x 505 (11th Cir. 2014) (citing Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005)); accord Casares v. Astrue, No. 4:11CV162, 2013 WL 960229, at *6 (S.D. Miss. Feb. 25, 2013), report & recommendation adopted, 2013 WL 960186 (S.D. Miss. Mar. 12, 2013) (citing Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983)); Morris v. Astrue, No. 4:11-CV-631-Y, 2012 WL 4468185, at *8 (N.D. Tex. Sept. 4, 2012), report & recommendation adopted, 2012 WL 4466144 (N.D. Tex. Sept. 27, 2012) (citing Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999)); Ranes v. Astrue, No. 3:08-CV-2030-D, 2009 WL 2486037, at *3 (N.D. Tex. Aug. 14, 2009) (citing Randall v. Astrue, 570 F.3d 651, 657-59 (5th Cir. 2009)).

In making his step two finding, the ALJ found that plaintiff's adjustment disorder was not severe because Conley had no limitations in his activities of daily living, only mild limitations in social functioning and in concentration, persistence, and pace, and no episodes of decompensation. As the ALJ explained (Tr. 14-15), these conclusions are substantially supported by the medical evidence. Psychologist Sandra Durdin, Ph.D., performed a consultative examination on March 31, 2014. She opined that Conley did not have a severe mental disorder and that his ability to handle the mental demands of work was not impaired. (Tr. 319-20). The notes of plaintiff's treating psychiatrist, John Kevin Jackson, M.D., and treating psychologist, James T. Russell, during examinations between

May 10, 2013 and August 13, 2014, state that they routinely found that, although Conley had some depressive or anxiety symptoms, all mental status indicators were within normal limits or had minimal deficits, and that plaintiff reported improvement with treatment. (Tr. 630, 634-35, 645-46). Dr. Jackson made such findings on February 18, 2014 (Tr. 616-17), the same date he stated in a letter that plaintiff would find it "very difficult . . . to properly interact with others in a work situation." (Tr. 327). Dr. Jackson's statement in this regard is contradicted by his own and Dr. Russell's treatment notes before and after this date, and by Dr. Durdin's opinions based on an examination six weeks later. While Conley was hospitalized at Tulane Medical Center from April 3 through April 9, 2014 for a cardiac workup, his treating physicians noted that he could have diazepam if he needed it for his anxiety and adjustment disorders, but that it was a "non-issue" and "[h]e required no medication for this during this hospitalization." (Tr. 350, 346).

Conflicts of evidence between a treating physician's opinions and those of another medical expert "are for the Commissioner, not the courts, to resolve.'" Byrd v. Comm'r of Social Sec., 368 F. App'x 542, 543 (5th Cir. 2010) (quoting Perez, 415 F.3d at 461). A physician's statement that a patient is disabled does not mean that the patient is disabled for purposes of the Act because that is a determination that may be made only by the Commissioner. Miller v. Barnhart, 211 F. App'x 303, 305 (5th Cir. 2006) (citing Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003)).

As to plaintiff's urinary frequency and urgency, the treatment notes by his doctors do not reflect symptoms as severe as he testified. He cites no objective medical evidence that substantially supports his testimony. The medical records show that Conley reported no difficulty with urination during an emergency room visit on March 8, 2013. (Tr. 272). The only instances of reported urinary incontinence occurred during two episodes of syncope in May 2012 and April 2013. (Tr. 495, 519). The records state that plaintiff had a history of urinary hesitancy, frequency and urgency before December 16, 2013 (Tr. 618, 630), but was treated with tamsulosin since then. After tamsulosin was prescribed, Conley did <u>not</u> report urinary incontinence to any health care provider, including consultative examiner, internist Cristino Dijamco, M.D., who examined him on March 9, 2014 in conjunction with his application for DIB and SSI. (Tr. 313-15). Tamsulosin was administered during plaintiff's hospitalization at Tulane Medical Center in April 2014 and the records of that admission do not reflect any problem with urinary incontinence. (Tr. 346). Conley denied any incontinence at his final visit with his treating neurologist, Rima El-Abassi, M.D., on June 6, 2014. (Tr. 544-45).

A medical condition that can reasonably be remedied by surgery, treatment or medication is not disabling. <u>Muckelroy v. Astrue</u>, 277 F. App'x 510, 511-12 (5th Cir. 2008) (citing <u>Burnside ex rel. Burnside v. Bowen</u>, 845 F.2d 587, 592 (5th Cir. 1988), <u>abrogated on other grounds by</u> <u>Sullivan v. Zebley</u>, 493 U.S. 521, 527 (1990)); <u>Hebert v. Barnhart</u>, 197 F. App'x 320, 323 (5th Cir. 2006) (citing 20 C.F.R. §§ 416.930, 404.1530(b);

Johnson v. Bowen, 864 F.2d 340, 348 (5th Cir. 1988)); Lopez v. Massanari, 273 F.3d 1094,

2001 WL 1085089, at *1 (5th Cir. Aug. 29, 2001) (citing 20 C.F.R. §§ 404.1530, 416.930;

Johnson v. Sullivan, 894 F.2d 683, 685 n. 4 (5th Cir. 1990)).  The medical treatment

evidence supports the ALJ's finding that plaintiff's urinary problems were not severe.

Plaintiff was diagnosed with mild sleep apnea during a sleep study at Tulane on

April 9, 2014 and received a CPAP machine on April 18, 2014.  (Tr. 346, 392, 557).  On

July 23, 2014, he was seen in followup and he reported no complaints.  He was noted to be

using the machine only 48 percent of the time and using it for more than 4 hours per day

only 6 percent of the time, with goals in both categories being more than 70 percent.

Conley was counseled about better sleep hygiene.  (Tr. 533-34).  On August 11, 2014, he

reported to Dr. Russell that he still had some sleep problems, used the CPAP machine

"most nights," but fell asleep without it some nights.  Dr. Russell "strongly suggested he

use it!"  (Tr. 528).  Conley told Dr. Jackson on August 13, 2014, that he was waking up

after one and one-half hours of using the CPAP machine, sometimes went back to sleep and

sometimes was up the rest of the night.  (Tr. 524).  Dr. Jackson prescribed doxepin as

needed for sleep.  (Tr. 524-25).

A claimant's failures to seek treatment or comply with prescribed treatment are

relevant factors to consider in determining the severity of an alleged impairment and may

be used in conjunction with the medical reports to discount his complaints of disabling pain

or other limitations.  Clayborne v. Astrue, 260 F. App'x 735, 737 (5th Cir. 2008); Doss v.

Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Scales v. Barnhart, 363 F.3d 699, 705 (8th Cir. 2004); Bryan v. Halter, 252 F.3d 1357, 2001 WL 422878, at *2 (5th Cir. Apr. 5, 2001) (citing 20 C.F.R. §§ 404.1530, 416.930; Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir. 1991)). The medical evidence does not indicate that plaintiff was fully complying with his sleep apnea treatment regimen. In addition, he cites no evidence of any functional limitations caused by sleep apnea.

The ALJ's findings regarding the non-severity of Conley's impairments of adjustment disorder, urinary frequency and mild sleep apnea are supported by substantial evidence. Accordingly, this assignment of error lacks merit.

### 2. The ALJ considered the combined effects of plaintiff's impairments.

The ALJ found at step two that Conley has severe impairments of cardiac dysrhythmia and syncopal episodes and at step three that he has the residual functional capacity to perform light work, except that he can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; must avoid all exposure to workplace hazards such as moving machinery and heights; occasionally reach in all directions; and once per quarter, on an unpredictable basis, miss work for one day. Plaintiff argues that the ALJ erred by failing to consider the combined effects of his multiple impairments.

Conley again relies on diagnoses of conditions that are merely listed in his medical history, are not supported by any objective medical evidence and/or as to which the record reveals no specific functional limitations, including environmental allergies, hearing loss

in one ear, Meniere's disease,[16] temporomandibular joint syndrome,[17] arthralgia,[18] headaches and hypertension.  The mere diagnosis of and treatment for an impairment does not establish disability.  Bordelon v. Astrue, 281 F. App'x 418, 422 (5th Cir. 2008) (citing Hames, 707 F.2d at 165); McLendon v. Barnhart, 184 F. App'x 430, 431 (5th Cir. 2006); Harris v. Barnhart, 65 F. App'x 129, 132 (9th Cir. 2003); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998).  Plaintiff "'must show that [he] was so functionally impaired [by his diagnosed impairments] that [he] was precluded from engaging in any substantial gainful activity.'"  Bordelon, 281 F. App'x at 422 (quoting Hames, 707 F.2d at 165) (emphasis added); accord Taylor, 706 F.3d at 603; Randall v. Astrue, 570 F.3d 651, 658-59 (5th Cir. 2009); Anthony v. Sullivan, 954 F.2d 289, 293 (5th Cir. 1992).

Plaintiff's list of subjective complaints and diagnoses does not establish any combined effects that the ALJ did not address.  The ALJ's review of the medical evidence is accurate and thorough.  He stated that he had considered all of plaintiff's impairments.  His statement and findings are supported by substantial evidence.  The medical evidence

---

[16]Ménière's disease is a disorder of the membranous labyrinth of the inner ear marked by recurrent attacks of dizziness, tinnitus and hearing loss.  Medline Plus Medical Dictionary (Merriam-Webster, Inc. 2017), http://c.merriam-webster.com/medlineplus/Meniere's%20disease (visited Jan. 31, 2017).

[17]Temporomandibular joint syndrome is a group of symptoms that may include pain or tenderness in the temporomandibular joint or surrounding muscles, headache, earache, neck, back or shoulder pain, limited jaw movement or a clicking or popping sound in the jaw.  Id., http://c.merriam-webster.com/medlineplus/temporomandibular%20joint%20syndrome (visited Jan. 31, 2017).

[18]Arthralgia is pain in one or more joints.  Id., http://www.merriam-webster.com/medlineplus/arthralgia (visited Jan. 31, 2017).

indicates that Conley's hypertension was well controlled when he took his blood pressure medication (Tr. 538, 613, 622, 630) and uncontrolled when he was not compliant with his medications. (Tr. 278, 350, 639, 650, 652, 664). The records contain only a few mentions of headaches and complaints of musculoskeletal pain that were controlled with medication, while findings on physical examination of plaintiff's back, neck, joints and extremities were routinely within normal limits. Accordingly, this assignment of error lacks merit.

> 3.    The ALJ followed proper legal standards in determining how much weight to accord the opinions of Conley's treating physicians.

Conley argues that the ALJ "essentially ignored" the opinions of his treating psychiatrist, Dr. Jackson, in his February 18, 2014 letter. Plaintiff's memorandum, Record Doc. No. 21 at p. 15. Conley contends that the ALJ should have given those opinions substantial weight. As previously discussed, the ALJ considered Dr. Jackson's letter in conjunction with the entirety of the medical evidence and found that Dr. Jackson's assessment that Conley would find it "very difficult . . . to properly interact with others in a work situation" was not supported by the treatment record or by Dr. Durdin's consultative opinion, to which the ALJ assigned great weight. (Tr. 19, 327).

Generally, the opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. However,

> the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. The treating physician's opinions are not conclusive. The opinions may be assigned little or no weight when good

23

> cause is shown.  Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.

Newton, 209 F.3d at 455-56 (quotations and citations omitted).

As he is required to do, the ALJ in the instant case assessed the credibility of the witnesses and weighed and resolved conflicts in the medical evidence.  "The ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'"  Ramirez v. Colvin, 606 F. App'x 775, 779 (5th Cir. 2015) (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); accord Yates v. Colvin, 606 F. App'x 225, 229 (5th Cir. 2015) (citing Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994)).  When the ALJ has relied on reports from consultative examiners and adequately dealt with any dispute between physicians, his residual functional capacity determination "must be upheld under the substantial evidence standard, because reliance on the analysis of these doctors is more than a mere scintilla, and any evaluation of the accuracy of the analysis is beyond the scope of this court's review."  Fontenot v. Colvin, No. 16-30075, 2016 WL 5400419, at *2 (5th Cir. Sept. 27, 2016) (citing Taylor, 706 F.3d at 603; Perez, 415 F.3d at 461; Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)).

The ALJ carefully considered, but ultimately rejected, Dr. Jackson's opinion that Conley's ability to function in a work environment was seriously limited because that conclusion was not supported by the treatment notes of Dr. Jackson and Dr. Russell, or by

Dr. Durdin's opinions.  In opining that plaintiff's anxiety disorder was not severe, Dr. Durdin specifically stated that his "ability to get along with others in a work setting including co-workers and supervisors is not impaired."  (Tr. 319-20).

"[T]he Act empowers the ALJ to analyze the physicians' testimony.  Substantial evidence supports the ALJ's decision to disregard [Dr. Jackson's] . . . conclusions.  That basis is enough to survive our review."  Greenspan, 38 F.3d at 237.  Accordingly, this assignment of error lacks merit.

    4.    The ALJ considered all of the evidence in determining plaintiff's residual functional capacity to "sustain" gainful employment.

After finding that Conley has the residual functional capacity to perform light work with certain postural and environmental restrictions, the ALJ found at the fourth step of the sequential evaluation that plaintiff could return to his past relevant work as a probation and patrol officer.  Conley argues that the ALJ did not have substantial evidence that he had the residual functional capacity to sustain significant gainful employment, primarily because the ALJ failed to give adequate consideration to plaintiff's diagnosed mental impairments, urinary problems and sleep disorder.  Conley asserts that the ALJ failed to consider or include in his hypotheticals to the vocational expert the combined effects of plaintiff's multiple impairments and side effects of medications.  He argues that his attorney's hypotheticals, which included limitations that he would be absent once every month for at least two days or would have to take unscheduled breaks of five to ten minutes once every hour, more accurately reflect his residual functional capacity.

As previously discussed, the ALJ's findings regarding the non-severity of plaintiff's mental health condition, urinary problems and sleep apnea are supported by substantial evidence. Also as previously discussed, the ALJ adequately considered the combined effects of Conley's impairments. In addition to the medical records discussed in previous sections of this report, the medical evidence substantially supports the ALJ's finding that plaintiff's severe impairments of cardiac dysrhythmia and syncopal episodes are not disabling.

The medical evidence in the record begins on January 13, 2013, when Conley went to the Lallie Kemp Hospital emergency room, complaining of neck and chest pain at a level of 4 on a scale of 10. He was noted to be in no distress. A chest x-ray and physical examination were normal. He was diagnosed with atypical chest pain. (Tr. 681-84).

Conley reportedly experienced two to four episodes of syncope (fainting) between 2011 and December 2013. (Tr. 495, 519, 577, 613). The first documented episode occurred on March 8, 2013, when he was admitted to North Oaks Hospital for four days. He was discharged with diagnoses of unspecified transient cerebral ischemia[19] and resolved partial seizure. (Tr. 268-80). On March 25, 2013, Conley reported that he had had no problems since his discharge. (Tr. 669).

---

[19]"A very brief interruption of blood supply to the brain usually without lasting effects is called a ministroke or a transient ischemic attack." Id., http://c.merriam-webster.com/medlineplus/stroke (visited Jan. 23, 2017).

At a cardiology consult on April 29, 2013, plaintiff reported back pain, but his physical examination findings were normal. (Tr. 519-20). On May 10, 2013, at his first documented visit with Dr. Jackson, Conley reported not sleeping well, feeling stressed, being easily irritated and agitated, and decreased appetite, but also reported that he was out of all medications, had good energy and walked five to ten miles per day. (Tr. 658-59). The same day, he told a nurse that he had pain in his neck and shoulder at a level of 4 on a scale of 10, which was controlled with naproxen, and he did not need additional medical intervention. (Tr. 661). A cardiac stress test on May 15, 2013 revealed that Conley's exercise capacity was above average for his age. (Tr. 504-05).

On May 17, 2013, plaintiff reported that his right hand had been numb for a few seconds the previous day, but he had not dropped the cup he was holding and had experienced no other symptoms. He admitted not taking his medications regularly. He had normal findings on physical examination. (Tr. 650-52).

On June 4, 2013, plaintiff told Dr. Jackson he was doing a little better, his medications were working well and he was sleeping well. (Tr. 645). On September 16, 2013, it was noted that Conley was not taking his blood pressure medications. (Tr. 639-41). On October 25, 2013, he told Dr. Jackson his mood had been up and down, he had trouble staying asleep some nights, and he was sometimes depressed and irritable. Dr. Jackson prescribed cyclobenzaprine and diazepam to help plaintiff sleep. (Tr. 634-36).

At a cardiology appointment on December 16, 2013, plaintiff's hypertension was better controlled with medication.  He reported one episode since his last cardiology visit of transient dizziness when changing his position from sitting to standing.  He asked for help for urinary hesitancy and lower urinary tract symptoms, and the doctor prescribed tamsulosin.  Physical examination findings were normal. (Tr. 630-32).

Conley saw Dr. Russell on December 30, 2013, for symptoms of depression and lack of sleep the previous night, although he was compliant with his medications.  He "felt much better" after talking and reviewing coping skills with Dr. Russell, who assessed plaintiff's mood as stable.  (Tr. 628-29).

On January 27, 2014, Conley told his treating internist, John Finn, Jr., M.D., that he felt well and had no new medical problems.  He reported urinary frequency without excessive urination at night, but with urgency.  Physical examination findings were normal. Dr. Finn increased plaintiff's dosage of tamsulosin.  (Tr. 619-22).

Plaintiff underwent a thorough physical examination by internist Dr. Dijamco on March 8, 2014, which revealed "no medically discernible impairment" other than hearing loss and use of a hearing aid in plaintiff's left ear.  (Tr. 313-15).

Conley had "pre-syncopal" symptoms on March 10, 2014 that resolved when he sat down (Tr. 613-14) and a "near syncopal episode" with exertional chest pain, shortness of breath and dizziness on April 3, 2014, for which he was admitted to Tulane Medical Center.  (Tr. 352, 377).  He had no syncopal (fainting) episodes after that date.

Plaintiff had a cardiac workup at Tulane in March 2014 and had a heart catheterization and sleep study done at Tulane on April 9, 2014.  Upon discharge from Tulane on that date, plaintiff's prior diagnoses of seizure and/or transient ischemic attack in 2013 were replaced by diagnoses of cardiogenic, rather than neurologic, causes for his syncopal episodes.  He was a candidate for a pacemaker.  (Tr. 577-84).  Upon his discharge, plaintiff was directed to resume activity as tolerated, but he should not drive. (Tr. 329).  He reported to a nurse two days later that he was "doing okay!  [D]enies any [shortness of breath], chest pain, nausea, diaphoresis, weakness or discomfort . . . .  [A]ble to tolerate meals and med[ication]s without problems."  (Tr. 560).

Upon discharge from East Jefferson General Hospital on May 9, 2014, after pacemaker implantation, plaintiff's treating physician told him to avoid strenuous activity or heavy lifting, but to begin light activity and gradually return to full activity.  (Tr. 697). On June 5, 2014, Conley rode his bicycle 15 miles to the VA clinic.  Although he reported left arm numbness following that ride, he had no other symptoms and his physical examination was normal.  Nurse practitioner Kowaleski diagnosed plaintiff's left arm problem as positional, advised him to avoid pressure on his arms when he rode home, and encouraged him to remain active and exercise daily.  (Tr. 546-48).  Conley reported to health care providers on January 27, March 21, July 7 and August 13, 2014 that he was in no pain.  (Tr. 527, 539, 586).

The ALJ acknowledged that plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but found that Conley's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible.  Determining the credibility of plaintiff's subjective evidence of pain and disability is a necessary part of the ALJ's consideration of the evidence.  Luckey v. Astrue, 458 F. App'x 322, 326 (5th Cir. 2011) (citing Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); Perez, 415 F.3d at 462.  The ALJ is bound to explain his reasons for rejecting a claimant's subjective complaints, but "is not required to 'follow formalistic rules in [his] articulation.'"  Hernandez, 278 F. App'x at 339 (quoting Falco, 27 F.3d at 164). The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'"  Spruill v. Astrue, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164).  Thus, the ALJ's credibility evaluation is entitled to considerable deference by this court.  McKnight v. Astrue, 340 F. App'x 176, 181 (5th Cir. 2009) (citing Newton, 209 F.3d at 459); Bedford v. Astrue, 236 F. App'x 957, 962 (5th Cir. 2007) (citing  Newton, 209 F.3d at 459).  The ALJ's explanation of his reasons for finding plaintiff not entirely credible is all that is required. Undheim v. Barnhart, 214 F. App'x 448, 450-51 (5th Cir. 2007) (citing 20 C.F.R. § 404.1529(c); Falco, 27 F.3d at 164); James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 163); Godbolt v. Apfel, No.

30

98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999). The ALJ in the instant case followed these principles, explaining that the medical evidence did not substantiate that Conley experienced problems as serious as he testified and that the records include objective findings indicating that he did not have such severe limitations. These conclusions are substantially supported by the medical evidence discussed above.

The ALJ incorporated in plaintiff's residual functional capacity determination all of the symptoms and functional limitations that he found credible, based on the entire record. Once the ALJ determines plaintiff's residual functional capacity, he may rely on vocational expert testimony at the fourth and/or fifth steps of the sequential evaluation to reach conclusions about the specific requirements of a particular occupation, including working conditions and the attributes and skills needed. Villalpando v. Astrue, 320 F. App'x 208, 211 (5th Cir. 2009); Weary v. Astrue, 288 F. App'x 961, 967 (5th Cir. 2008); Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).

The ALJ posed a hypothetical to the vocational expert that accounted for plaintiff's age, education, work experience and physical limitations that the ALJ found credible. The vocational expert testified that such a person could perform plaintiff's past relevant work as a probation and parole officer. Conley was represented at the hearing by counsel, who questioned the vocational expert. An ALJ's hypothetical question is defective and will not be allowed to stand unless it reasonably incorporated all of the disabilities recognized by the ALJ, "and the claimant or his representative is afforded the opportunity to correct

deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994); accord Vaught v. Astrue, 271 F. App'x 452, 456 (5th Cir. 2008); Boyd v. Apfel, 239 F.3d 698, 706-07 (5th Cir. 2001).

In this case, plaintiff's counsel questioned the vocational expert and asked her about the effects of plaintiff's alleged additional impairments that would cause him to be absent from the workplace excessively, and Knight testified that such a claimant could not perform any jobs. However, the ALJ found that the record did not support such limitations. Substantial evidence supports the ALJ's finding in this regard. Therefore, the ALJ was not required to include such limitations in his hypothetical. Carey v. Apfel, 230 F.3d 131, 143 (5th Cir. 2000).

Accordingly, this assignment of error lacks merit.

<u>CONCLUSION</u>

The ALJ did not err by failing to find that plaintiff's anxiety and mood disorder, urinary frequency and obstructive sleep apnea are severe impairments. The ALJ properly considered the combined effects of plaintiff's impairments. The ALJ applied appropriate legal standards to make his residual functional capacity findings, which are supported by

substantial evidence.  The ALJ considered all of the evidence in determining plaintiff's residual functional capacity to "sustain" gainful employment.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[20]

New Orleans, Louisiana, this ____2nd____ day of February, 2017.

 

 

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[20]Douglass referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.